UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

WASHINGTON CARABALLO,

Plaintiff,

-against-

THE CITY OF NEW YORK, NEW YORK CITY POLICE DEP'T, POLICE OFFICER CHRISTOPHER O'HARE, POLICE OFFICER JOHN DOE #1, and POLICE OFFICER JOHN DOE # 2,

Defendants.

-----------------------------------------------------------x

05 Civ. 8011 (GEL)

**OPINION AND ORDER**

Robert Blossner, New York, New York, for Plaintiff.

Michael A. Cardozo, Corporation Counsel of the City of New York (Jay Kranis, Assistant Corporation Counsel, of counsel), for Defendants.

GERARD E. LYNCH, District Judge:

Plaintiff Washington Caraballo brings this action pursuant to, *inter alia*, 28 U.S.C. § 1983 and New York state law, alleging that the City of New York, the New York City Police Department, and Police Officer Christopher O'Hare (collectively, "defendants")[1] violated his constitutional rights by subjecting him to an illegal arrest and criminal prosecution. Defendants have moved for summary judgment on numerous grounds, chiefly that the arrest was supported

---

[1] Plaintiff's complaint also names two "John Doe" police officers. Although, as discussed below, a number of other officers who had some involvement in the incident giving rise to this lawsuit have been identified in discovery, plaintiff has not sought to amend his complaint to name any of those officers as defendants, and no defendant other than those named in the text has been named or served.

by probable cause and that the prosecution was similarly justified. The motion will be granted in part and denied in part.

**BACKGROUND**

Defendants argue that Caraballo was legally arrested for impersonating a police officer after a nightclub security guard, Karl Cooper, advised police that Caraballo had shown the guard a fake badge and claimed to be a police officer.

A number of facts relating to the incident are disputed. There is agreement at least as to the following. The arrest occurred sometime during the late-night or pre-dawn hours from November 21 to November 22, 2003. Caraballo, a school bus driver, had arrived at a Manhattan nightclub accompanied by an acquaintance.[2] A line of people waited to be admitted. Caraballo approached a security guard, Cooper, to ask if he might enter just to see if a friend was already there, saying that he would then return outside. Cooper asked Caraballo for his identification. Caraballo produced his New York State commercial driver's license from a wallet that also contained Caraballo's membership card from a private organization known as the Police Reserve Association and a small badge also issued to him by that organization. Cooper held onto the license and allowed Caraballo to enter the club. Caraballo soon reemerged as promised.

At this point, the witnesses' accounts diverge. Caraballo testified at his deposition that, upon reemerging from the club, he asked Cooper to return his license, but that Cooper refused, stating as his reason that Caraballo's acquaintance – who, Caraballo says, was no longer present – had been giving him trouble about not being admitted to the club. According to Caraballo,

---

[2] Caraballo knew the acquaintance only as Miguel. He apparently has not been further identified, and has not given testimony in the case.

Cooper's refusal to return his driver's license prompted him to call the police three times from his cell phone. It is undisputed that Caraballo made these calls.

At his deposition, Cooper supplied the following rather different narrative. According to Cooper, once Caraballo reemerged from the club, Cooper returned his license. Caraballo then asked Cooper to re-admit him, but this time with his acquaintance. Cooper re-admitted Caraballo without question but asked to see his acquaintance's identification. The acquaintance attempted to pass off as his own the driver's license Caraballo had just presented as his identification. Cooper refused to accept the license as the acquaintance's identification, pointing out that it was actually Caraballo's, but Caraballo denied that it was his. Cooper then confiscated the license, telling Caraballo that he could retrieve it later from a police station. Caraballo then showed Cooper the badge he carried in his wallet, saying, "I'm a cop" (Cooper Dep. 16), and demanding that his license be returned and that he be admitted to the club. Cooper refused these demands, recognizing that the badge was "obviously one of the miniaturized [private association] shields." (Id.) Cooper agrees that, when he refused to return the driver's license, Caraballo called 911.

Caraballo vigorously and explicitly denies that he ever told the guard he was a cop or showed him either his Police Reserve Association membership card or badge. (P. Dep. 61.)

Police officers – although the record is not entirely clear about their number, names, and respective roles in the events[3] – soon arrived. Caraballo testified that he approached two officers

[3] Cooper has testified that "[s]everal [police] cars" were present, and that there were "four to five police officers" in the "general area." (Cooper Dep. 20, 51.) He could not name any of the officers. (Id.) Caraballo at one point testified that he did not know the name of the one officer with whom he conversed and who eventually arrested him (P. Dep. 49), but at another testified that the officer was defendant O'Hare (id. at 81-82). He also testified that he

who had arrived by patrol car and told one of them that Cooper had refused to return his driver's license. He says that the officer told him to wait by the patrol car and then walked over to speak with Cooper, out of Caraballo's earshot. Cooper testified that he told the officers that Caraballo had shown him a badge and identified himself as a police officer, and that he then turned Caraballo's driver's license over to the officer. (Cooper Dep. 20-21, 50-51.) According to Cooper, following this exchange, he observed but did not overhear the police having "another conversation with [Caraballo] and the next thing I know he was being" searched and handcuffed. (Id. 21.)

Caraballo confirms that after the officer spoke with Cooper, he returned to Caraballo and asked if he had any other identification besides the driver's license. Caraballo opened his wallet and produced the Police Reserve Association membership card. According to Caraballo, the officer questioned Caraballo about his membership in the organization, his nationality, and his citizenship status. When Caraballo informed the officer that he was a U.S. citizen, the officer asked him "if I was an American citizen . . . why I don't speak perfect English." (P. Dep. 56.) The officer then informed Caraballo that "the I.D., it was fake," and "so he arrested me." (Id.) Defendants do not address Caraballo's account of this interaction.

---

only observed two officers on the scene. (P. Dep. 57.) An internal police report referring to the incident, however, names four officers – a Sergeant Petersen, a Detective Rindler, an Officer Burns, and O'Hare – as being present. (Ex. R.) O'Hare has attested that he and his partner, Michael Burns, arrived at the scene sometime after two other officers, William Bedell and Louis Maniscalco, who are not named in the report. (O'Hare Decl. ¶ 5.) According to O'Hare, the officer with whom Caraballo spoke, and who eventually handcuffed and placed Caraballo in a patrol car, was Bedell. (Id. ¶¶ 6, 7.) Indeed, O'Hare states that "Mr. Caraballo was placed under arrest by P.O. Bedell" (O'Hare Decl. ¶ 8), although defendants' summary judgment brief identifies O'Hare as the arresting officer (D. Mem. 9), as it was O'Hare who processed the arrest.

Of the several officers possibly on the scene, defendants offer only O'Hare's account, in the form of an affidavit.[4] O'Hare attests that, "[b]y the time . . . I had arrived," officer Bedell "had spoken with both . . . Caraballo . . . and . . . Cooper." (O'Hare Decl. ¶ 6.) "As P.O. Bedell was putting handcuffs on . . . Caraballo and placing [him] in the patrol car," O'Hare recalls, "I spoke with Mr. Cooper and was informed by him that . . . Caraballo had shown Mr. Cooper what appeared to be a police badge and identification card in order to gain entry for [plaintiff's acquaintance], stating[,] 'What's the problem? He's with me. I'm a cop.'" (Id. ¶ 7.) O'Hare further states that he was informed by Bedell "that he had recovered a badge which states 'Police Reserve Association, City of New York member'" and "an identification card with the same inscription" from plaintiff's wallet (id. ¶ 8.) O'Hare states that he later prepared incident reports "on the basis of information supplied to me by Mr. Cooper and P.O. Bedell." (Id. ¶ 10.)

Caraballo was charged with criminal impersonation and criminal possession of a forged instrument on O'Hare's complaint. In the complaint, O'Hare repeats that he had been informed by Cooper that Caraballo "showed [Cooper] what appeared to be a police badge and identification card in order for defendant's friend . . . to gain entry to [the nightclub] and that [Caraballo] stated in substance 'What's the problem? He's with me. I'm a cop.'" (Kranis Decl., Ex. T.) The complaint further states that Bedell had told O'Hare he had "recovered" the Police Reserve Association badge and membership card "from [Caraballo's] wallet," that "no such Association is recognized by the . . . Police Department," and that Caraballo "knows said instruments to be forged based on [his] statement that he does not attend any training or meeting

[4] Plaintiff apparently did not seek to depose O'Hare or any of the other officers identified in the discovery materials as having been present for some or all of the events in question.

of said association and that he received the badge and identification card in the mail." (Id.)

Caraballo was released from custody on November 23, 2003. The charges against him were dismissed on April 5, 2004.

**DISCUSSION**

I. Summary Judgment Standard

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in favor of the non-moving party. Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). The moving party bears the burden of establishing the absence of any genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). In deciding a summary judgment motion, the court must "resolve all ambiguities and draw all reasonable references in the light most favorable to the party opposing the motion." Cifarelli v. Vill. Of Babylon, 93 F.3d 47, 51 (2d Cir. 1996). In addition, the court is not to assess credibility or weigh the evidence at this stage. Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996).

The nonmoving party, however, may not rely on "conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). It "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and must make a "showing sufficient to establish the existence of [every] element essential to that party's

case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

II. The City Defendants and the State Claims

Certain aspects of defendants' motion are uncontested. The City of New York seeks summary judgment on the ground that plaintiff has failed to present any evidence tending to establish municipal liability under Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658 (1978); the New York City Police Department moves for dismissal on the ground that it is not a suable entity, see New York City Charter ch. 17, § 396; and all defendants seek summary judgment on plaintiff's state law claims, on the ground that they are time-barred. Plaintiff having failed to respond in any way to these contentions, and the Court having independently discovered no reason to decide otherwise, plaintiff is deemed to have abandoned any opposition to these, in any event meritorious, arguments. Accordingly, summary judgment is granted to defendants City of New York and New York City Police Department on all claims, and to all defendants with respect to plaintiff's state law claims. The only remaining claims are plaintiff's federal constitutional claims of false arrest and malicious prosecution against O'Hare.

II. The Constitutional Claims Against O'Hare

A. False Arrest

O'Hare argues that summary judgment should be granted on the ground that there is no genuine factual dispute that probable cause existed for plaintiff's arrest. Probable cause would constitute a complete defense to this unconstitutional arrest claim. See Covington v. City of New York, 171 F.3d 117, 122 (2d Cir. 1999); Okst, 101 F.3d at 852; Bernard v. United States,

25 F.3d 98, 102 (2d Cir. 1994).[5] Whether probable cause for the arrest existed may be "determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." Okst, 101 F.3d at 852.

Probable cause exists "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Singer, 63 F.3d at 119. Even if that information turns out to have been false, and even if that information supported a different charge than any actually filed, probable cause will be found as long as the arresting officer acted reasonably, given all of the circumstances, in relying on the information to believe that the arrestee had committed an offense. Devenpeck v. Alford, 543 U.S. 146, 152-54 (2004); Illinois v. Gates, 462 U.S. 213, 230-32 (1983); Bernard, 25 F.3d at 102-03. The existence of probable cause "is measured as of the moment of the arrest, not [based] on later developments." (D. Mem. at 8, citing Beck v. Ohio, 379 U.S. 89 (1964).)

O'Hare argues that "[t]he fact that Cooper informed the police that Caraballo exhibited a badge and identified himself as a cop . . . is, in [and] of itself, enough to establish that there was probable cause for Caraballo's arrest." (D. Mem. at 9.) It is correct – indeed, plaintiff does not dispute – that the information provided by Cooper, if it was in fact given to the police before Caraballo was detained and was reasonably reliable under the circumstances, would have justified an arrest. What complicates decision is that the record in this case leaves considerable

[5] To prove an unconstitutional arrest, a plaintiff must show (1) that defendants intended to confine him, (2) that he was conscious of his confinement, (3) that he did not consent to be confined, and (4) that the confinement was not otherwise privileged. Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995). Defendants do not dispute that plaintiff would be able to show the first three elements.

confusion about what O'Hare actually did, and what information he had when he did it.

Caraballo claims that O'Hare arrested him after speaking with Cooper and returning to question Caraballo and discover his badge and membership card, although he has also stated that he did not know the name of the officer who did these acts. O'Hare himself testifies that he was not the first officer to arrest Caraballo; on his account, Caraballo was already in handcuffs when O'Hare spoke to Cooper and was told of Caraballo's earlier claim to be a police officer. Cooper describes only one conversation with one or more police officers, during which he advised the police of Caraballo's alleged impersonation and after which the police spoke with Caraballo and then arrested him.

All accounts place O'Hare's involvement with the arrest after at least some officer had obtained information from Cooper. Caraballo's testimony is clear that the officer who arrested him, whom he at one point identifies as O'Hare, spoke to Cooper first, and did not observe or seize Caraballo's badge and membership card until after that conversation; Caraballo, however, did not hear the conversation. O'Hare avers that Bedell had spoken to both Cooper and Caraballo before O'Hare arrived and Bedell handcuffed Caraballo, although he says nothing about what, if anything, Bedell heard from Cooper; however, O'Hare testifies that he himself spoke to Cooper and was told that Caraballo had flashed the badge and claimed to be an officer, before he took charge of the arrest.[6] Cooper testifies that he told one or more officers (whom he cannot specifically identify, although he believed his principal interlocutor was a sergeant), apparently in a single conversation, that Caraballo had impersonated an officer, before the

---

[6] Caraballo testified that he did not remember whether the police spoke to Cooper again after arresting him. (P. Dep. 61.)

officer(s) returned to Caraballo, had some further conversation, and placed him under arrest; on Cooper's account, whether O'Hare was part of the group that listened to him and then arrested Caraballo or came along later, the critical accusation had been conveyed to the officers before Caraballo was arrested.

As defendants point out, moreover, there is only one account of what Cooper told the officers: both Cooper and O'Hare agree that Cooper described Caraballo as having impersonated an officer.[7] Since the conversation took place out of Caraballo's hearing, he cannot specifically contradict the reported content of that conversation, and there is thus no *direct* evidence against the defense account of that exchange.

Caraballo, however, points to circumstantial evidence that could cast doubt on that account. As noted, Caraballo emphatically denies Cooper's testimony that he ever showed Cooper a badge or claimed to be an officer. Ordinarily, the fact that an arrested person denies having committed the crime charged creates an issue of fact only as to whether he is guilty, and not as to whether the police had probable cause to arrest him; if Cooper actually and believably told the police that Caraballo had impersonated an officer, the police would have had probable cause to arrest, whether or not Caraballo denied having done so. "[W]hen an officer has

---

[7] Since O'Hare, the only officer whose testimony has been presented to the Court, does not report that Bedell knew of Cooper's version of events before arresting Caraballo, his testimony does not exclude the possibility that Bedell arrested Caraballo without probable cause. But Bedell's lacking probable cause would not necessarily render *O'Hare* liable for false arrest, if, as O'Hare attests, O'Hare was aware of Cooper's accusation before he exercised any dominion over Caraballo, and if he knew of no reason not to rely on Cooper's information. Moreover, if O'Hare's version of events is accepted, any false arrest by Bedell could have resulted in only nominal damages to Caraballo, since the putative illegality of the arrest lasted at most until O'Hare obtained probable cause by interviewing Cooper, since probable cause could be based on the collective knowledge of all the officers at the scene. See United States v. Colon, 250 F.2d 130, 137 (2d Cir. 2001)

received information from some person – normally the putative victim or eyewitness – who it seems reasonable to believe is telling the truth, he has probable cause." Oliveira v. Mayer, 23 F.3d 642, 647 (2d Cir. 1994).

Under the particular circumstances present here, however, if a factfinder credited Caraballo's testimony, it would be virtually impossible to find that Cooper had told the police, without prompting, the story that he claims to have told. Where a putative victim claims to have been assaulted or robbed by a suspect, for example, evidence that the suspect is innocent gives little reason to doubt that the accusation was made, since the accuser could easily have been mistaken, or even have invented the charge. Here, however, it would be beyond plausible coincidence for Cooper to have made up a story about being shown a badge, by a person who upon search turns out to have just such a badge in his possession. For Cooper to have told the police about the badge unprompted – in other words, before the police seized it from Caraballo – he would have had to have seen it when Caraballo was showing him his driver's license. According to Caraballo, however, not only did he never show Cooper his purported police badge, but Cooper could not have seen it, even accidentally:

> Q. And when you opened your wallet to take out your driver's license to give it to the security guard could you also see the badge?
>
> A. No because it was covered with a handkerchief.

(P. Dep. 53.) Thus, if Caraballo's account is believed, Cooper could not have seen the plaintiff's badge at all before police recovered it. Unlike the usual case when a purported eyewitness or victim tells the police about a crime, there is little room here for a false or mistaken report. Either the incident actually occurred as Cooper described it, or, if Caraballo is telling the truth

and he never exposed the badge to Cooper, then Cooper cannot have told the police about the episode until after the badge had been discovered by the police.

Of course, the odds that a jury will believe Caraballo are long indeed. To accept Caraballo's version, a jury would have to believe not only that Cooper would falsely accuse Caraballo of a crime, but that he would do so only after first speaking with police without mentioning any impersonation. In effect, the jury would have to believe that the police elicited Cooper's story only after they discovered the badge in Caraballo's possession and – either intentionally or in a grossly incompetent deviation from proper investigative technique – told Cooper about or showed him what they had seized from Caraballo. Further, for a jury to believe that O'Hare in particular participated in arresting Caraballo without probable cause, it would also have to (1) believe that, as he swears, O'Hare arrived only after police had placed Caraballo under arrest – and after police had, presumably, elicted Cooper's story – but that O'Hare nevertheless knew that he should not rely on the information he swears Cooper told him in order to maintain custody of plaintiff, or (2) disbelieve O'Hare's testimony that he was not among the officers who initially questioned plaintiff and Cooper and placed plaintiff under arrest, instead believing that O'Hare participated in eliciting a false story from Cooper, or (3) believe O'Hare's testimony that he arrived after officers' initial questioning of Cooper and arrest of plaintiff, but disbelieve his testimony of independently receiving from Cooper information that, without a reason to doubt it, would have provided probable cause. Any of these sequences of events would seem quite far-fetched. Nevertheless, however unlikely it may be that a jury would reach such a conclusion, the issue ultimately turns on credibility. It is axiomatic that "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for

the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996); Okst, 101 F.3d at 854.

On the present record, moreover, the credibility question is further clouded by certain inconsistencies. As noted above, Cooper, O'Hare, Caraballo and police documents give quite different accounts of how many officers were present and which played what role in the arrest. The parties' decision not to depose or seek affidavits from any officers other than O'Hare leave these inconsistencies unexplained. In addition, there are differences between Cooper's own recollection of relevant events and O'Hare's account of what Cooper told him. For instance, O'Hare swears that he was "informed by [Cooper] that [Caraballo] had shown Mr. Cooper what appeared to be a police badge and identification card in order to gain entry for Mr. Caraballo's friend, stating, 'What's the problem? He's with me. I'm a cop.'" (O'Hare Decl. ¶ 7.) However, in the portions of Cooper's deposition testimony submitted to the Court, Cooper does not state that plaintiff showed him such an identification card or that he told police that plaintiff had done so; he mentions only that plaintiff showed him a badge and that he told police of this act. (See Cooper Dep. at 16-17, 44, 51.) Further, Cooper specifically denies that by allegedly flashing his badge, Caraballo was seeking admittance of his acquaintance to the club:

> Q: Was he also asking that his friend be let in?
>
> A: I won't say that. His friend at this point seemed to be moving away . . . .
>
> Q: So the friend was no longer trying to get in?
>
> A: Correct.

(Id. at 17, 45.)

Despite the seeming unlikelihood of Caraballo's version of events, it cannot be said that this is the "rare" case in which the only factual issues are created by testimony of the plaintiff that is "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint," Jeffreys v. The City of New York, 426 F.3d 549, 554-55 (2d Cir. 2005) (internal quotation marks and citations omitted), and that the issues therefore cannot be considered genuine. Summary judgment must therefore be denied defendants as to plaintiff's claim of false arrest.[8]

III. Malicious Prosecution Claim

Defendants seek summary judgment on Caraballo's malicious prosecution claim on the ground that plaintiff will be unable to prove either or both of two necessary elements of the claim. See Rohman v. N.Y.C. Transit Auth., 215 F.3d at 208, 215 (2d Cir. 2000) (enumerating elements of malicious prosecution claim). First, defendants argue that plaintiff will be unable to prove that O'Hare lacked probable cause to believe a prosecution could succeed. See id. Because this argument rests on the same factual basis as the defense to the false arrest allegation – namely, that Cooper purportedly told police that plaintiff had displayed a badge and claimed to be a police officer (D. Mem. at 11; D. Rep. Mem. at 6-7) – it must be rejected at this stage for the same reasons discussed above.

Second, defendants argue that O'Hare cannot be found to have initiated the prosecution

---

[8] Defendants' argument that there was probable cause to believe that Caraballo possessed a forged instrument (D. Rep. Mem. at 6) is unpersuasive. Defendants contend that the police reserve badge resembles a legitimate NYPD badge sufficiently closely to "establish[] probable cause that plaintiff possessed a forged instrument . . . , or, at a bare minimum, [to] make[] it reasonable for the police officers to believe that [he did]" (id.). The closeness of the resemblance presents a genuine issue of fact, particularly in light of Cooper's testimony that it was "obviously" not a real police badge. (Cooper Dep. 17.)

against plaintiff, see Rohman, 215 F.3d at 215, because the decision of a prosecutor to pursue charges constitutes an independent judgment, breaking the chain of causation between the prosecution and an arresting officer. See Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999); (see also D. Rep. Mem. at 8). Yet, as defendants acknowledge (D. Rep. Mem. at 8), any legal absolution ordinarily provided an officer by a prosecutor's decision will not preclude liability where the officer "withholds relevant and material information" or "creates false information likely to influence a jury's decision and forwards that information to prosecutors." Mitchell v. Victoria Home, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006), citing Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997). It is not implausible on the existing record that O'Hare's information to the district attorney could be found to have been untruthful or materially incomplete. A reasonable factfinder could, as discussed, disbelieve that Cooper reliably told police, including O'Hare, that plaintiff had shown him a badge and claimed to be a police officer, and consequently could infer that O'Hare's information cannot have been accurate. The remaining issues of fact cannot be resolved at this stage, and therefore summary judgment must be denied defendants as to the malicious prosecution claim.

IV. Qualified Immunity

Defendants argue that O'Hare is entitled to qualified immunity, because, "[e]ven if there were some basis to believe that there was not actual probable cause to arrest plaintiff, P.O. O'Hare's conduct did not violate any constitutional right of which a reasonable police officer would have known, and was based upon information clearly sufficient to give rise to a finding of arguable probable cause." (D. Mem. at 18.) Unquestionably, the right not to be arrested without probable cause was a clearly established right of which O'Hare most certainly should have been

aware. See Saucier v. Katz, 533 U.S. 194, 201-03 (2001) (discussing the clearly-established-right inquiry in determining qualified immunity).

Deciding whether his conduct was based upon information clearly sufficient to support a finding of "arguable probable cause" – whether his conduct was, in other words, reasonable, even if mistaken, under the circumstances, Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002) – requires factual conclusions. Yet the essential fact defendants proffer in support of their argument for qualified immunity is, again, that "Caraballo was identified by Cooper as having tried to gain entry to [the nightclub] for himself and his friend by exhibiting what appeared to be a police badge and identification card, stating that he was a cop." (D. Mem. at 18.) As already discussed, the persistence of genuine issues precludes adopting this fact at least for the present. Summary judgment thus cannot be awarded on the issue of qualified immunity.

**CONCLUSION**

Defendants' motion for summary judgment is granted in part, in that all claims against the City of New York and the New York City Police Department, and all claims under state law, are dismissed. The motion is denied with respect to the federal constitutional claims against defendant O'Hare.

SO ORDERED.

Dated: New York, New York
May 31, 2007

GERARD E. LYNCH
United States District Judge